E-FILED
Tuesday, 02 August 2005 08:28:26 AM
Clerk, U.S. District Court, ILCD

RECEIVED

JUL 26 2005

U.S. CLERK'S OFFICE
PEORIA, ILLINOIS

Steven D. Donovan,

        Petitioner,

  vs.

Alberto R. GONZALES, U.S. Attorney General,
and Rick Veach, Warden, FCI Pekin,

        Respondents.

FILED

AUG 1 - 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Civil No. _____05-1218_____

## MEMORANDUM OF LAW IN SUPPORT OF PETITION TO VACATE AN ILLEGAL CONVICTION PURSUANT TO 28 U.S.C. § 2241

Steven D. Donovan, a natural person,[1] hereby petitions this Court to vacate his illegal/unconstitutional convictions pursuant to the provisions of 28 U.S.C. § 2241 based on the following;

### FACTS OF THE CASE

On January 7, 1992, Steven Donovan, (hereinafter "Petitioner") was charged in three counts of a seven count superseding indictment with various offenses prescribed by the Controlled Substance Act of 1970; specifically, Title 21 U.S.C. §§ 841(a)(1), 846. The indictment was brought to the U.S. District Court for the Eastern District of Wisconsin at Milwaukee, case no. 91-CR-265.

On February 27, 1992, a jury returned guilty verdicts on the three counts charged. On October, 18, 1992, Petitioner was sentenced to Life w/o parole.

---

1. A "natural person", as defined by Black's law, is a human-being, as distinguished from an artificial person created by Law.

## JURISDICTION

Federal courts have jurisdiction to "entertain an application for a writ of habeas corpus ... only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States," see Coleman v. Thompson, 501 U.S. 722, 730 (1991)("The court does not review a judgment, but the lawfulness of the petitioner's custody..." Id.).

"The writ of habeas corpus [is] to determin[e] whether the person restrained of his liberty is detained without authority of law" or whether there has been "a denial of a right secured under the Federal Constitution." See Felts v. Murphy, 201 U.S. 123. 129 (1906). Accord, e.g., Harrlan v. McGourin, 218 U.S. 442, 445, 447 (1910).

If this court finds that Petitioner's claim—that the charges brought by the Department of Justice in this case, were brought without legislative authorization—has merit, such a claim would be enforceable under 28 U.S.C. § 2241.

To be sure, the Seventh Circuit, in In re Davenport, 147 F.3d 605, 609 (1999), held that where a defendant claims that he was convicted for conduct that was not made criminal by the statutes under which he was prosecuted, he would be entitled to proceed under § 2241 because such an argument goes "to the fundamental legality of their sentences." Id.

In Preiser v. Rodriguez, 411 U.S. 475, 485-487 (1973), the Court conducted a thorough examination of the writ of habeas corpus, particularly of § 2241. In so doing, it noted that "the use of habeas corpus to secure release from unlawful physical confinement, whether judicially imposed or not, was thus [by

2

the time of the independence of the American colonies] an integral part of our common-law heritage." In its discussion, the Court equated challenges on, inter alia, that the trial was held on a defective indictment, and that the prisoner is being unlawfully detained by the Executive as argued by Petitioner infra. The Court concluded by holding that "the respondents' suits in the District Court fell squarely within this traditional scope of habeas corpus." Id. U.S. at 487.

In INS v. St. Cyr, 533 U.S. 289, 302 (2001), the Court found that "the issuance of the writ [of habeas corpus] was not limited to challenges to the jurisdiction of the custodian, but encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes." Significantly, the Court found that "...§ 2241 descends directly from § 14 of the Judiciary Act of 1789 and the 1867 Act. ... Its text remained undisturbed by ... AEDPA..." Id. n. 25. The Court concluded that "... habeas jurisdiction under § 2241 was not repealed by AEDPA ..." Id. U.S. at 314.

Article I, §9, cl. 2, of the Constitution provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." The Suspension Clause protects the writ "as it existed in 1789." Felker v. Turpin, 518 U.S. 651, 663-664 (1996).

Because of that Clause, judicial intervention in this case is unquestionably required by the Constitution.

3

ABSENT CONGRESSIONAL INTENT, THE UNITED STATES
GOVERNMENT LACKED LEGAL AUTHORITY TO CHARGE
DEFENDANT UNDER 21 U.S.C. § 841 CONSIDERING
HE WAS/IS NOT OF THE "CLASS" OF PERSONS WHOM
THE STATUTE SWEEPS INTO ITS CRIMINAL AMBIT

## HISTORY OF THE CONTROLLED SUBSTANCES ACT OF 1970

STATUTORY SCHEME

Congress enacted the Controlled Substances Act, 21 U.S.C.
§ 801 et seq., ("CSA") as part of the Comprehensive Drug Abuse
Prevention and Control Act of 1970, Pub.L. 91-513, 84 Stat. 1236.
See Attachment 1. The CSA establishes five "schedules" of certain
drugs and other substances and designates these items "controlled
substances." 21 U.S.C. §§ 802(6), 812(a). The CSA was an act to
amend prior existing laws and regulations. This Act created a
"closed" system of drug distribution for **legitimate** handlers of
controlled substances. (See H.R. Rept. N. 91 Congress 2d sess.
Reprinted in 1970, U.S. Code. Cong. & Ad News, pg. 4566-4572).

"The CSA was intended to replace the some 50 pieces of
legislation dealing with drugs that had been enacted by Congress
since 1914." United States v. Rosenberg, 515 F.2d 190, 195-96
(9th Cir. 1975) citing House Report at 45, 71.

Congress passed the CSA based on its authority under the
Commerce Clause of the Constitution. U.S. Const. art. I, § 8,
cl. 3.

4

The Tenth Circuit found that, "The CSA, ...established a comprehensive **regulatory** framework to prevent the criminal diversion of drugs with legitimate purposes but high potentials for abuse. The Act requires practitioner who dispense controlled substances to register with the Attorney General. See 21 U.S.C. § 822." Harline v. DEA, 148 F.3d 1199, 1202 (1998).

Under the CSA, drugs are controlled through the exercise of the rule-making authority of the Attorney General, 21 U.S.C. §§ 811, 912. As shown below, the rules do not apply to Petitioner because he is not among the "class" of persons that Congress intended the prohibitions of the CSA to reach.

"As in all cases involving statutory construction, our starting point [the Supreme Court said] must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." American Co. v. Paterson, 456 U.S. 63, 68 (1982).

The following excerpts, drawn from the 1970 Congressional Record (Senate), illistrate the intent of the Controlled Substances Act:

> Mr. President, there is a great proliferation of legitimately produced drugs in America at this time. As an example, there are approximately 8 billion amphetamine pills produced in the United States each year. It has been estimated that 50 percent

5

of these pills, 4 billion of them **are diverted from legitimate** to illegitimate uses. Access to drugs, narcotics, stimulants, and depressants of all kinds is all too easy and tight controls are necessary if the availability of these substances is to be limited.

116 Congressional Record, Senate, at pg. 118, Jan. 26, 1970.

At this time, Mr. President, I will summarize the contents of each of the titles in the bill.

### Title I

Title I sets forth findings and declaration which establish the need for this legislation. It also defines the terms used in the bill. More specifically, this title reaffirms the Federal Government's role in drug control. Basically, this role is to regulate the **legitimate drug trade to** p**revent diversion** of medically useful dangerous drugs **into illegitimate** channels and to help reduce the criminal traffic in all narcotic and dangerous drugs on the local, national and international level.

### Title III

Title III **regulates** the manufacture, distribution and dispensing of controlled drugs.

The **objective here** is to establish the registration of **persons involved in the legitimate drug trade,** to provide for records, reports, order forms, and prescriptions to cover the dispensing and other transactions involving controlled drugs.

**All these provisions are designed to reduce diversion** of drugs from the **legitimate course of commerce and use to illegal channels...**

Id. at 996. Jan. 24, 1970.

Based on the above facts, Congress made the following findings and declarations, as reproduced in their entirety for the convenience of this Court:

(1) Many of the drugs included within the Subchapter have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.

(2) The illegal importation, manufacture, distribution and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic, which are not an integral part of the interstate or foreign flow, **such as local distribution and possession,** nonetheless have a substantial and direct effect upon interstate commerce because—

   (A) After manufacture, many controlled substances are transported in interstate commerce,

   (B) Controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and

   (C) Controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

(5) Controlled substances manufactured and distributed **intrastate** cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, in terms of controls, it is not feasible to distinguish between controlled substances manufactured and distributed intrastate.

(6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.

(7) The United States is a party to the Single Convention on Narcotic Drugs, 1961 and other international conventions designed to establish effective control over international and domestic traffic in controlled substances.

(Pub. L. 91-513, Title II, §101, Oct. 27, 1970, 84 Stat. 1242.)

Congress' reasoning in its findings that it is not feasible

to distinguish between incidents of <u>intrastate</u> manufacture and

distribution of controlled substances and incidents of <u>interstate</u>

manufacture and distribution rests on the fact that many **legitimate**

7

manufacturers only distribute their product to local hospitals, doctors offices, dental or medical clinics, or private physicians and pharmacists. Some manufacturers' and distributors' products travel interstate to other regions of the Nation, or to areas of international dimension. Because Congress could not determine what products were being distributed where, or by whom, without tighter controls, it was not feasible to distinguish between the two incidents of interstate or intrastate transactions of these substances. Congress intended to stop diversion of these substances by legitimate persons of the drug industry by providing that all persons in the legitimate drug trade register with the Attorney General in accordance with 21 U.S.C. §§ 822, 957.

The legislative history of the CSA provides that "all **persons engaged in the legitimate** distribution chain involving drugs... must be registered with the Attorney General." The statutes and the regulations give effect to this Congressional policy. United States v. Clinical Leasing Serv., Inc., 759 F. Supp. 310, 315 (E.D.La. 1990) aff'd. 925 F.2d 120 (5th Cir. 1991).

Examination of the legislative history of the CSA of 1970, convinced a unanimous Supreme Court, in United States v. Moore, 423 U.S. 122, 135 (1975), that Congress intended § 841(a)(1) of the Act to apply to registered and unregistered licensed doctors. "Congress was particularly concerned with the diversion of drugs from legitimate to illegitimate channels." Id. U.S. at 135.

8

In <u>United States v. Rosenberg</u>, 515 F.2d 190, 193 (9th Cir.
1975), the court found that, "The registration system, which
requires written records to be maintained of drug transfers
**from manufacturer to user**, was intended to serve as a means of
monitoring the flow of drugs in an effort **to stop diversion** to
illegal uses." Citing H.R.Rep.No.91-1444, 1970 U.S.Code, Cong.
& Admin.News 4566, 4571-72, 4590. "This legislative intent is
manifested in those penalty provisions of the Act that are
applicable only to registrants." See, e.g., 21 U.S.C. §§ 842(a)(1)
(use of prescriptions required), 843(a)(1)(use of order forms
required).

The concept of registration is the "heart" of the statute.
<u>United States v. Blanton</u>, 730 F.2d 1425, 1430 (11th Cir. 1984),
citing <u>Moore</u>, supra, 423 U.S. at 140.[2]

In <u>Blanton</u>, the court addressed the question of whether a
licensed physician not registered for methaqualone, a Schedule
II N substance, can be prosecuted under § 841(a)(1) for dispensing
such substance when not specifically authorized by his registration.
A physician who dispenses a Schedule II substance when, for example,
his registration is limited to Schedule I, acts outside what his
registration authorizes and is therefore subject to prosecution
under the Act. See 21 U.S.C. § 822(b).

---

2. The quesiton of whether possession with intent to
distribute homemade **un**controlled drugs by persons not licensed/
registered, or otherwise affiliated with a commercial entity,
is prohibited conduct that falls within the range of criminal
liability under § 841 was not before the <u>Moore</u> Court, nor was
it an issue before the courts in the cases cited below, therefore
it was not addressed.

9

The statute makes clear that physicians cannot dispense drugs for which they are not authorized. The court held that "defendant Blanton clearly falls within the statutory prohibition and not the exception because he was not registered to dispense methaqualone." Blanton, 730 F.2d at 1430.

The authorized exception to the prescription against dispensing controlled substances are contained in part C of the Act — 21 U.S.C. § 822(b) — which specifies that:

> Persons registered by the Attorney General under this subchapter to ... dispense controlled substances ... to the extent authorized by their registration and in conformity with the other provisions of this Subchapter.

Title 21 U.S.C. § 841(a)(1), the section charged here, provides:

### (a) Unlawful acts[3]

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distrubute, or dispense, a **controlled** substance;...

---

3. Interestingly, the Third Circuit found that "the original version of the CSA passed by Congress and signed by the President did not affix the label 'Unlawful Acts' to § 841(a) or 'Penalties' to § 841(b). ... Nor were these captions added in any of the subsequent amendments to the CSA. Rather, these section headings can be traced to the Office of the Federal Register, National Archives and Records Services, which added a reference to 'penalties' as a margin note to the predecessor of § 841(b) in the Statutes at Large simply for user convenience. 84 Stat. 1261 (1970). Unfortunately, when the CSA was reproduced in the U.S. Code, the margin notes were converted into subsection headings by the codification committee, but have never been officially adopted by the Congress, and therefore, do not have the force of law. See U.S.C. at vii (1994 & Supp. V 1999)(noting that Title 21 has never been officially codified)." U.S. v. Vazques, 271 F.3d 93, 111 (3th Cir. 2001)

10

"The 'except as authorized by this subchapter' proviso
in § 841 refers to Subchapter I of Chapter 13 of Title 21,
and that subchapter runs from § 801 through § 904." United States
v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998).

In United States v. Green, 511 F.2d 1062, 1067-68 (1975),
the Seventh Circuit determined that "when title 21 U.S.C. § 841(a)
refers to 'dispense,' it can only mean that physicians as well
as other practitioners are subject to the proscription of that
section if their actions are not authorized by the subchapter."[4]

Title 21 U.S.C. § 823 provides the various "types" of
registration available to a particular applicant thereunder.
Hence, not all registrations are identical. A registration of
a manufacturer, for example, is distinguished from a
registration for a distributor and so on. It is here that the
"except as authorized by this subchapter" proviso of § 841(a)
unfolds. It is obviously clear that one may only manufacture,
distribute or dispense, for example, within the terms of his
registration since no two registrations are the same. If one
exceeds the limits of what his registration lawfully permits
him to do, he exceeds what is "authorized" by his registration;

---

4. The term "dispense" means to deliver a controlled substance
to an ultimate user or research subject by, or pursuant to the
lawful order of, a practitioner... 21 U.S.C. § 802(10)

11

has diverted from the "usual course of professional practice,"
and is subject to the penalties of the Act—whether minor technical
violations or criminal in character. Thus, a person is "authorized"
under the subchapter by what type of activity his registration
authorizes. See United States v. Hill, 589 F.2d 1344, 1350 (8th
Cir. 1979).

The Sixth Circuit, in United States v. Flowers, 818 F.2d
464, 467 (1987), concluded that:

> ...Congress intended that a person could violate
> § 841(a)(1) without actually distributing the
> controlled substance, but only by writing a
> prescription for their distribution.

The present Act [CSA] replaced the Harrison Narcotics Act
of 1914, 38 Stat, 785 (1914), the prohibitions of which (against
dispensing narcotics) were applied to registered physicians
who acted beyond the course of their professional practice. See
United States v. Behrman, 258 U.S. 280 (1922).

The CSA was an amendment to the Federal Food, Drug &
Cosmetic Act of 1938 ("FDCA"). The Ninth Circuit realized that
the FDCA "was not designed to deal with the wholly gratuitous
distribution of homemade substances." [5] United States v. Geborde,
278 F.3d 926, 928 (2002). The 1938 Act was an amendment to the
Pure Food and Drug Act of 1906, 21 U.S.C. § 301, et seq.

---

5. It is interesting to note that the Eighth Circuit inferred
a distinction between "pharmaceutical" drugs ["controlled drugs"]
and "street drugs." United States v. Young, 992 F.2d 207, 210 (1993).

12

"As in all cases of statutory construction, our task [the Supreme Court said] is to interpret the words of these statutes in light of the purposes Congress sought to serve." Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608 (1979)

Defendant contends, and the history of the CSA confirms, that the Act does not proscribe the conduct which is charged here, that is, the possession with intent to distribute a home-made substance by persons not regulated by the act.

Defendant avers that his analysis is buttressed by Congress itself when it stated:

...this title reaffirms the Federal Government's role in drug control. Basically, **this role is to regulate the legitimate drug trade** to prevent diversion of medically useful and dangerous drugs **into illegitimate channels...** The **object here is** to establish the registration of **persons involved in the legitimate drug trade...**

[116 Congressional Record - Senate, at 996, January 24, 1970]

In interpreting a statute "we must not be guided by a single sentence or member of sentence, but look to the provisions of the whole law, and to its object and policy." United States v. Williams, 136 F.3d 547, 550 (8th Cir. 1998) quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987).

In United States v. Collier, 478 F.2d 268, 273 (1973), the Fifth Circuit acknowledged that:

Appellant [an authorized physician] is a **member of a class** with legal access to drugs and a legal right to deliver or authorize delivery of drugs to other persons. An absolute exemption **of this class** from appropriate controls would enable drugs to be diverted from

13

legitimate channels to an illicit market. **For this very purpose** Congress fashioned the Comprehensive Drug Control Act to provide a "closed" system of drug distribution for legitimate handlers of such drugs... Congress could reasonablly decide that in order to effectively regulate interstate commerce, it was necessary that persons within the legitimate distribution channels, including the dispensing physicians and pharmacists, did not divert drugs into the illicit market. (Emphasis added)

"When Congress has made its intent clear, we must give effect to that intent." Miller v. French, 350 U.S. 327, 341 (2000).

It is clear from the record that Petitioner does not fit into the "class" of persons for whom the statute he is charged to have violated was principally designed. Approaching the issue from this point of view, Petitioner avers that the term "any person" as used in § 841(a) of Title 21 cannot be taken to mean any person in the United States, but must be taken to refer to the "class" with which the statute undertakes to deal, i.e., persons who are required to register with the Attorney General pursuant to 21 U.S.C. §§ 822, 957 and those persons identified in 21 C.F.R. § 1301 to end —— the regulations corresponding to §§ 801 through 904 of Title 21.

A prerequisite to registration is licensing. Since Petitioner is not licensed, nor could he be, to manufacture or distribute/ dispense controlled substances under the CSA, he would not be permitted to register. See Leary v. United States, 395 U.S. 6,

14

24, n.38 (1969). See also 21 C.F.R. § 1301.11.

On its face, the term "any person" as used in § 841(a) appears to apply to anyone—regardless of one's status. Although the starting point for construing a statute is the statutory language and its plain meaning, a court is not precluded from considering persuasive evidence of differing legislative intent. Berger v. Heckler, 771 F.2d 1556 (2nd Cir. 1985). Even the most basic principles of statutory construction must yield to contrary evidence of legislative intent. National R.R. Pass. Corp. v. National Budget Rent-A-Car, 502 F.Supp. 494 (D.C.N.Y. 1980) (construction of a statute should be followed unless there are compelling indications that it is wrong.)

The "word 'person' in legal terminology, such as statutes, is perceived as a general word which includes in its scope a variety of entities other than human being." Church of Scientology v. U.S. Dept of Justice, 612 F.2d 417, 418, 425 (9th Cir. 1975). See also Title 1 U.S.C. § 1.

It is significant to point out that the term "any person" as used in different parts of the same act [84 Stat. 1236] refers exclusively to registrants. For example, 21 U.S.C. § 842 **Prohibited acts B** prescribes:

**(a) Unlawful acts**

It shall be unlawful for **any person**—

(1) who is subject to the requirement of part C to distribute or dispense a controlled substance in violation of section 829

15

of this title.[6]

(2) **who is a registrant** to distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person or to manufacture a controlled substance not authorized by his registration.

21 U.S.C. § 843 **Prohibited acts C** prescribes:

**(a) Unlawful acts**

It shall be unlawful for **any person** knowingly or intentionally—

(1) **who is a registrant** to distribute a controlled substance classified in schedule I or II, in the course of his legitimate business, except pursuant to an order or an order form as required by section 828 or this title.

21 U.S.C. § 841(a) — like §§ 842(a), 843(a), uses the term "any person," yet those sections do not reach unregistered persons like Petitioner.

The Supreme Court made clear that when dealing with identical words in a statute "the interrelationship and close proximity of these provisions of the statute presents a classic case for

---

6. Part C of the act, §§ 821-829, covers the provisions for registration, production quotas for controlled substances, records and reports of registrants, order forms and prescriptions by licensed practitioners, pharmacists and manufacturers. See Attachment 1.

The Supreme Court, in Moore, supra, reasoned:

"Section 842(a)(1) can be sensibly interpreted only if it reaches non-registrants which is limited to 'any person—who is subject to the requirement of Part C.' Part C of the Act, §§ 821 - 829, covers the provisions for registration and applies to '[e]very person who manufactures, distributes, or dispenses any controlled substance or who proposes' to do so. § 822(a)  Presumably, § 842(a)(1) is so phrased in order to reach those who should have registered but failed to do so." Id. 423 U.S. at 135, n.11.

Note: The term "non-registrant," as used by the Supreme Court in Moore, means a licensed practitioner or manufacturer not registered in accordance with 21 U.S.C. §§ 822, 957,

16

application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." Commissioner v. Lundy, 516 U.S. 235, 250 (1996)(internal quotations and citations omitted).

"[W]here a word is given a consistent meaning throughout the U.S. Code, then the courts assume that it has that same meaning in any particular instance of that word." Firstar Bank, N.A. v. Faul, 253 F.3d 982, 990 (7th Cir. 2001).

The Supreme Court has recognized in other contexts, qualification of Petitioner as a "person" that falls within the scope of § 841(a) depends not "upon a bare analysis of the word 'person'," Pfizer Inc. v. Gov. of India, 434 U.S. 308, 317 (1978), but on the "legislative environment" in which the word appears, Georgia v. Evans, 316 U.S. 159, 161 (1942).

Petitioner is clearly excluded from the seemingly sweeping phrase "any person." It is obviously clear then that the term "any person" as used in § 841(a)—like § 842(a) and § 843(a)—is limited to: regulated persons,[7] registrants,[8] unregistered licensed practitioners, non-practitioners,[9]

---

7. The term "regulated person" means a person who manufactures, distributes, imports or exports a listed chemical... See 21 U.S.C. § 802(38)

8. The term "registrant" is defined as any person who is registered pursuant to 21 U.S.C. § 823 or § 958. See 21 C.F.R. 1300.01(40).

9. Non-practitioners are identified in 21 C.F.R. § 1301.90 to § 1301.93 as employees of authorized manufacturers, distributors and dispensers of controlled substances.

17

pharmacists, suppliers,[10] officers, agents,[11] and persons identified in the corresponding regulation, 21 C.F.R. §§ 1301 to end, which include those persons exempt from registration.

Examples of non-registrants and non-practitioners that are prosecutable under § 841 would be those persons authorized by regulation to possess and transport controlled substances but are exempt from registration. See 21 C.F.R. § 1301.22 (Exemption of agents and employees such as a contract carrier or warehouse-man or an employee thereof, whose possession of controlled substances is in the usual course of his business or employment). See also 21 U.S.C. § 822(c) and 21 C.F.R. § 1309.92.[12]

The Eighth Circuit explained that "when interpreting a statute we look not only to the express language, however, but also to the overall purpose of the act. We also must consider the design of the statute as a whole and ... its object and policy." In Re Graven, 936 F.2d 378, 385 (1991).

---

10. The term "supplier" means any registered person entitled to fill order forms pursuant to 21 C.F.R. § 1305.08. See § 1300.01(41).

11. The term "agent" means an authorized person who acts on behalf of or at the direction of a manufacturer, distributor or dispenser... See 21 U.S.C. § 802(2).

12.   21 C.F.R. § 1301.92 states, in pertinent part:
**Illicit activities by employees**
It is the position of DEA that employees who possess, sell, use or divert controlled substances will subject themselves ... to ... Federal prosecution for any illicit activity...

The legislative history of the CSA is replete with references to Congress' specific intent to control drugs which originate from an authorized manufacturer. The entire design of the CSA is to regulate, channel and permit manufacture, distribution and dispensing of controlled substances through a system of control by registration, labeling, packaging, quotas, record-keeping and prescription requirements, (see 21 USC §§ 821-829) a design that's echoed by the regulatory language corresponding to those section. See 21 C.F.R. § 1301.06, and § 1309.

In Flowers, supra, the Sixth Circuit, in recounting the district court's findings, noted that one of the "regulations promulgated under § 841(a)(1)" is 21 C.F.R. § 1306.04. 818 F.2d at 467. "The [district] court concluded that this regulation was not intended to apply to persons other than licensed physicians or pharmacists." Id.

The regulation, § 1306.04, as promulgated by the DEA, exclusively regulates the activities of practitioners' who proscribe and dispense controlled substances. See Attachment 2. In fact, all the regulations promulgated/published by the DEA, corresponding to 21 U.S.C. §§ 801 — 904, i.e., 21 C.F.R. §§ 1301 to end, make no mention of regulating the activities of unlicensed or unregistered persons, like Defendant, who purchase and sell homemade drugs in a non-commercial setting.

19

The Supreme Court, in <u>United States v. Mersky</u>, 361 U.S. 431, 437 (1960), commented, "As we see it, a construction of the regulation necessarily is an interpretation of the statute."

Section 841 is part of a statutory scheme designed to channel traffic in legitimately manufactured narcotics only to those persons lawfully entitled to be engaged therein.

Petitioner contends that the persons who could violate 21 U.S.C. § 841(a)(1) are only those persons who could violate the corresponding regulations.

In enacting the CSA of 1970, Congress was cognizant of its limitations under the Constitution as it was when enacting the Pure Food & Drug Act of 1906; the Harrison Narcotics Act of 1914 and the Food Drug & Cosmetics Act of 1938—the prohibitions of which exclusively targeted drugs that originated from a regulated/licensed source or entity.[13] The legislative mandate of the CSA is in sync with the act it amended, i.e., to control legitimately manufactured and distributed drugs by commercially licensed and regulated entities.

---

13. In <u>White v. United States</u>, 399 F.2d 813, 815 (8th Cir. 1968), a case that arose under the Drug Abuse Control Amendments of 1965 of the Federal Food, Drug & Cosmetic Act. 21 U.S.C. § 331(q)-(2), the court, quoting S.Rep.No. 337, to Accomp. H.R. 2, 89th Cong., 1st Sess., pp. 1895, 1896 (1965), pointed out, "The bill provides increased controls over the distribution of barbiturates, amphetamines, and other drugs having a similar effect on the central nervous system. The controls **are accomplished through increased record keeping and inspection requirements**, through providing for control over intrastate traffic in these drugs because of its effect on interstate traffic, and through making possession of these drugs (other than by the user) illegal outside of the legitimate channels of commerce." (Emphasis added)

"[I]t is the intent of the Congress that enacted [the statute] that controls." Oscar Mayer & Co. v. Evans, 441 U.S. 750, 758 (1979).

In light of the historical objective and purpose of pre-existing statutory provisions regulating the distribution of listed narcotics by persons involved in the legitimate drug trade, courts must presume if Congress had intended that the enactment of 21 U.S.C. § 841 expanded the reach of those earlier provisions, it would have done so in clear, unmistakable and unarguable language.[14]

"The courts presume that Congress will use clear language if it intends to alter an established understanding about what a law means;  if Congress fails to do so, courts presume that the new statute has the same effect as the older version." Firstar Bank, N.A., supra, 253 F.3d at 988 (7th Cir.).

Congress is understood to legislate against a background of common-law adjudicatory principles . . . the courts may take it as a given that Congress has legislated with an expection that the principle will apply except when a statutory purpose to the contrary is evident.

Astoria F.S. & L. Assn v. Solimino, 501 U.S. 104, 108 (1991)(cit-

14. The Sixth Circuit, in United States v. Tapert, 625 F.2d 111, 120 (1980), opined that "an amendment to an existing statute is not acknowledgment by Congress that original statute is invalid, but, rather, it is common and customary legislative procedure to enact amendments strengthening and clarifying existing laws." See also Passamaquoddy Tribe v. State of Me., 75 F.3d 784, 788 - 789 (1st Cir. 1996)(in interpreting statutes, courts should take  into account preexisting statutory provisions).

ations and quotation marks omitted) See also Green v. Bock
Laundry Machine Co., 490 U.S. 504, 521-522 (1989). It further
follows, therefore, the absence of such language makes patent
§ 841 was not intended to bring within its ambit persons outside
the  legitimate drug trade or outside the "class" of persons
authorized by license and registration to manufacture, deliver
or authorize delivery of drugs.

This claim is not to be confused with a challenge to
whether federal drug laws are valid exercise of Congress in
regulating commerce like the jurisdictional challenge presented
in United States v. Lopez, 514 U.S. 549 (1995). Several Circuits
have upheld the constitutionality of federal drug laws under
such challenges. See, e.g., United States v. Westbrook, 125
F.3d 996, 1009 (7th Cir. 1997); United States v. Davis, 288
F.3d 359, 362 (8th Cir. 2002).

The question propounded by Petitioner here is whether
possession with intent to distribute a homemade drug by a person
not registered or licensed with the Attorney General pursuant
to the pertinent statute and regulations, i.e., 21 U.S.C. § 822
and 21  C.F.R. § 1301 et seq., and § 1307.01 et seq., or employed
by a commercial entity required to register under said statute
and regulations, is prohibited conduct that falls within the
range of criminal liability under 21 U.S.C. § 841(a)(1).

22

Petitioner submits that in enacting the CSA, not unlike the act it amended, Congressional intent was/is to restrict its reach to persons required to register under the act as well as those persons identified in 21 C.F.R. § 1301 et seq.

Petitioner is not included among the "class" of persons that 21 U.S.C. § 841 was designed to encompass, therefore, he contends, the U.S. Federal Government lacked jurisdiction to determine his guilt or innocence since the indictment failed to charge an offense.

Indictment's failure to charge an offense constitutes a jurisdictional defect. United States v. Cabrera-Teran, 168 F. 3d 141 (5th Cir. 1999). A district court lacks jurisdiction to entertain a criminal case if it appears that the Government "lacked power to prosecute the defendant." United States v. Fitzhugh, 78 F.3d 1326, 1330 (8th Cir. 1996).

23

## CONCLUSION

The U.S. Federal Government, Petitioner contends, has no more lawful authority to convict him under 21 U.S.C. § 841(a)(1) than it has to charge and convict him, a United States born citizen, under Title 8 U.S.C. § 1325 ("Improper Entry By Alien").

It is clear from the debates held on the Senate floor, as illistrated herein, that Congress never intended such far-reaching results as have occurred from the misinterpretation of the CSA's operative intent by the Department of Justice.

Based on the reasons indicated, Petitioner Steven D. Donovan's convictions under 21 U.S.C. § 841(a)(1) must be deemed nullities entitling him to immediate release from custody, and resulting records of convictions expunged.

Submitted this _25_ day
of _July_ , 2005.

Steven D. Donovan

24

Public Law 91-513

### AN ACT

October 27, 1970
[H. R. 18583]

To amend the Public Health Service Act and other laws to provide increased research into, and prevention of, drug abuse and drug dependence; to provide for treatment and rehabilitation of drug abusers and drug dependent persons; and to strengthen existing law enforcement authority in the field of drug abuse.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Comprehensive Drug Abuse Prevention and Control Act of 1970".

Comprehensive Drug Abuse Prevention and Control Act of 1970.

### TABLE OF CONTENTS

TITLE I—REHABILITATION PROGRAMS RELATING TO DRUG ABUSE

Sec. 1. Programs under Community Mental Health Centers Act relating to drug abuse.
Sec. 2. Broader treatment authority in Public Health Service hospitals for persons with drug abuse and other drug dependence problems.
Sec. 3. Research under the Public Health Service Act in drug use, abuse, and addiction.
Sec. 4. Medical treatment of narcotic addiction.

TITLE II—CONTROL AND ENFORCEMENT

PART A—SHORT TITLE; FINDINGS AND DECLARATION; DEFINITIONS

Sec. 100. Short title.
Sec. 101. Findings and declarations.
Sec. 102. Definitions.
Sec. 103. Increased numbers of enforcement personnel.

PART B—AUTHORITY TO CONTROL; STANDARDS AND SCHEDULES

Sec. 201. Authority and criteria for classification of substances.
Sec. 202. Schedules of controlled substances.

PART C—REGISTRATION OF MANUFACTURERS, DISTRIBUTORS, AND DISPENSERS OF CONTROLLED SUBSTANCES

Sec. 301. Rules and regulations.
Sec. 302. Persons required to register.
Sec. 303. Registration requirements.
Sec. 304. Denial, revocation, or suspension of registration.
Sec. 305. Labeling and packaging requirements.
Sec. 306. Quotas applicable to certain substances.
Sec. 307. Records and reports of registrants.
Sec. 308. Order forms.
Sec. 309. Prescriptions.

PART D—OFFENSES AND PENALTIES

Sec. 401. Prohibited acts A—penalties.
Sec. 402. Prohibited acts B—penalties.
Sec. 403. Prohibited acts C—penalties.
Sec. 404. Penalty for simple possession; conditional discharge and expunging of records for first offense.
Sec. 405. Distribution to persons under age twenty-one.
Sec. 406. Attempt and conspiracy.
Sec. 407. Additional penalties.
Sec. 408. Continuing criminal enterprise.
Sec. 409. Dangerous special drug offender sentencing.
Sec. 410. Information for sentencing.
Sec. 411. Proceedings to establish previous convictions.

Attachment 1

GENERAL INFORMATION

## § 1306.01  Scope of part 1306.

Rules governing the issuance, filling and filing of prescriptions pursuant to section 309 of the Act (21 U.S.C. 829) are set forth generally in that section and specifically by the sections of this part.

## § 1306.02  Definitions.

Any term contained in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter.

[62 FR 13964, Mar. 24, 1997]

## § 1306.03  Persons entitled to issue prescriptions.

(a) A prescription for a controlled substance may be issued only by an individual practitioner who is:

(1) Authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession and

(2) Either registered or exempted from registration pursuant to §§ 1301.22(c) and 1301.23 of this chapter.

(b) A prescription issued by an individual practitioner may be communicated to a pharmacist by an employee or agent of the individual practitioner.

[36 FR 7799, Apr. 24, 1971, as amended at 36 FR 18732, Sept. 21, 1971. Redesignated at 38 FR 26609, Sept. 24, 1973, as amended at 62 FR 13966, Mar. 24, 1997]

## § 1306.04  Purpose of issue of prescription.

(a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

(b) A prescription may not be issued in order for an individual practitioner to obtain controlled substances for supplying the individual practitioner for the purpose of general dispensing to patients.

(c) A prescription may not be issued for the dispensing of narcotic drugs listed in any schedule for "detoxification treatment" or "maintenance treatment" as defined in Section 102 of the Act (21 U.S.C. 802).

[36 FR 7799, Apr. 24, 1971. Redesignated at 38 FR 26609, Sept. 24, 1973, and amended at 39 FR 37986, Oct. 25, 1974]

## § 1306.05  Manner of issuance of prescriptions.

(a) All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, di-

Attachment 2